**REPORT OF RICHARD M. LIPTON**

**Partnership Tax Errors of IRS Agent's Determinations with respect to**
***United States of America v. Rachel Diane Locricchio***

**April 26, 2024**

## I.   SUMMARY OF EXPERTISE

Richard M. Lipton is senior counsel in the Dallas office of the law firm of Baker & McKenzie LLP.  He advises clients in structuring partnership and real estate transactions and provides legal advice relating to tax planning for corporations, partnerships and limited liability companies.

Mr. Lipton has considerable experience in the area of partnership taxation.  He is a frequent speaker on various topics relating to partnership taxation and has published over 300 articles on tax-related matters, mostly concerning partnership taxation.  He is a co-author of the *Partnership Taxation* textbook and former adjunct professor at The University of Chicago Law School, where he taught a course on partnership taxation for many years.

Mr. Lipton currently is a member of the Board of Governors of the American Bar Association.  He is the former chair of the Tax Section of the American Bar Association and the Chicago Bar Association Federal Tax Committee, as well as a former member of the House of Delegates of the American Bar Association. Mr. Lipton is the former chair and a current member of the American College of Tax Counsel and also served on the Internal Revenue Service Advisory Council.  He is the recipient of the 2024 Distinguished Service Award, the highest honor awarded by the Section of Taxation of the American Bar Association to an individual who has had a distinguished career in taxation.

Mr. Lipton is a 1977 graduate of the University of Chicago Law School.  He received a B.A. from Amherst College.  He served as a clerk for Judge Cynthia Hall of the United States Tax Court.

Mr. Lipton has given numerous speeches at organizations throughout the United States, including the Tax Executives Institute, Practicing Law Institute, ALI-ABA, American Bar Association, University of Chicago Tax Institute and the Southern Federal Tax Institute, among others.  Mr. Lipton's publications listing is attached to this report.

## II.   EXECUTIVE SUMMARY

The United States of America (the "Government") alleges that Rachel Locricchio ("Locricchio"), a certified public accountant employed at the accounting firm, Rehmann, willfully aided and assisted in preparing a false and fraudulent Form 1065 for Gravity Imaging LLC ("Gravity Imaging") for the 2018 taxable year. According to the Government's expert witness, Kelly Williams, an Internal Revenue Service Revenue Agent (hereinafter, the "IRS Agent"), (1) Gravity Imaging should have been treated as a disregarded entity rather than a partnership because Robin Street Consultants, LLC ("Robin Street") was not a valid partner of Gravity Imaging for U.S. federal income tax purposes (or, at a minimum, Gravity Imaging terminated as a partnership upon Robin Street's redemption on December 21, 2017), (2) Gravity Imaging should not be respected as a partnership for U.S. federal income tax purposes because "the relationship with [Robin Street] was created to transfer payments for illegal referrals, which does not constitute a substantial business purpose under [Treasury Regulation Section[1]] 1.701-2(a)(1);" (3) the transfer of capital in Gravity Imaging from Robin Street to Mann Global LLC ("Mann Global"), a limited liability company wholly owned by Cory Mann ("Mann") resulted in a taxable capital shift to Mann, and (4) payments made by Gravity Imaging to J&A Consultants, Inc. ("J&A") for marketing services should have been recharacterized as member distributions or guaranteed payments.

First and foremost, the IRS Agent cannot make any such determination outside of a partnership audit of Gravity Imaging, given that notice was never provided to Mann.  Both TEFRA and the BBA partnership

---

[1] Unless expressly indicated otherwise, all "Section" references in this report refer to sections of the Internal Revenue Code, as amended (the "Code") and the Treasury Regulations promulgated thereunder.

1

audit regimes generally require the Internal Revenue Service ("IRS") to resolve partnership-related items through a single centralized proceeding at the partnership level. In the case of a partner under criminal investigation, the IRS may only make adjustments or determinations about partnership-related items outside of a partnership audit if written notice is provided to the partner under investigation. The filing of a Form 1065 for Gravity Imaging provides prima facie evidence that there was a partnership for U.S. federal income tax purposes. Because all of the IRS Agent's determinations involve partnership items, these determinations are impermissible in an individual matter, absent notice to Mann which was never provided.

Even if the IRS Agent could raise the issue of Gravity Imaging's partnership status for U.S. federal income tax purposes, the IRS Agent's conclusion that Robin Street should not have been respected as a partner of Gravity Imaging is patently flawed; the IRS Agent completely ignores the parties' intent, which is the key factor in determining whether a particular arrangement constitutes a partner-partnership relationship for tax purposes. Moreover, the IRS Agent's alternative determination that Gravity Imaging terminated upon Robin Street's redemption on December 21, 2017, is incorrect under Section 708 and the Treasury Regulations promulgated thereunder. A partnership only terminates for tax purposes when the operations of the partnership are discontinued and no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership. Given that Mann Global continued the business of Gravity Imaging and a replacement partner was always intended and, in fact, was admitted effective January 1, 2018, the transitory lapse of a second partner should be disregarded for U.S. federal income tax purposes. In other words, the redemption and subsequent admission of a second partner in Gravity Imaging should be stepped together and treated as a single transaction. Regardless, the temporary termination of Gravity Imaging as a partnership for U.S. federal income tax purposes would not have resulted in any additional tax owed by Gravity Imaging or Mann under Sections 731 and 721 of the Code.

The IRS Agent also grossly misapplies the partnership anti-abuse rule of Treasury Regulation Section 1.701-2 by conflating the requirement that each partnership transaction be entered into for a "substantial business purpose" with a requirement that each partnership transaction be legal. The partnership anti-abuse rule is merely a regulatory clarification of the scope and limitations of the judicial tax doctrines, promulgated to ensure partnership transactions are consistent with the intent of subchapter K. The fact that the IRS Agent thinks any illegal activity would frustrate a "substantial business purpose" for purposes of Treasury Regulation Section 1.701-2 indicates her lack of understanding of partnership taxation.

Furthermore, the IRS Agent's determination with respect to the transferred capital from Robin Street to Mann Global is inaccurate. A capital shift can be taxable only if it is compensatory in nature. Here, the transferred capital was a result of Robin Street's redemption and was not compensatory. Accordingly, at most, there was a deemed distribution of property by Gravity Imaging followed by a recontribution of that property to Gravity Imaging, both of which are nontaxable under Section 731 and Section 721, respectively. The Schedule K-1s issued to Mann Global and Robin Street properly reported the transferred capital, including a notation that Mann Global's basis did not increase as a result of the shift, thus preserving the inherent gain in the transferred capital.

The IRS Agent's final determination as to the characterization of the marketing expenses paid to J&A is irrelevant, as it makes no difference from the perspective of Mann or J&A whether the payments were reported as fees for services, guaranteed payments or distributive shares of income; the net tax owed and reported by each of the parties would have been identical.

Thus, Gravity Imaging's 2018 Form 1065 was properly prepared as to each of the IRS Agent's determinations that relate to the allegations against Locricchio, such that Locricchio could not have been involved in aiding or assisting in the preparation and presentation of a false return. Further, because the IRS Agent (1) did not take into account that all of the matters that she raised are "partnership items" which require a partnership-level proceeding under TEFRA and BBA, (2) did not consider the rules and

2

regulations concerning the existence of a partnership under *Culbertson* or its continuation under Section 708, (3) completely misunderstood the scope and purpose of the partnership anti-abuse regulations, (4) did not realize that there cannot be a taxable capital shift in a non-compensatory situation and (5) did not appreciate that there is no practical difference between payments to a partner addressed under Sections 707(a) and 707(c), it is obvious to me that the IRS Agent is not an expert in partnership taxation.

## III. SYNOPSIS OF FACTS

The following statement of facts in the United States of America v. Rachel Diane Locricchio case (the "Case") is based upon a review of various court pleadings and documents set forth in the Addendum to this report:

From 2015 until January 2021, Mann engaged the accounting firm, Rehmann, to prepare his business and personal tax returns. Locricchio, a certified public accountant employed at Rehmann during such time, was the main point of contact for Mann and the person primarily responsible for preparing such returns. In this role, Locricchio collaborated with other subordinate, lateral, and senior colleagues at Rehmann. Bryan Kearis, who was managing principal of Rehmann and Locricchio's supervisor during such time period, approved and signed each of the tax returns prepared for Mann by the firm, which amounted to over 80 returns.

As customary in the tax preparation industry at accounting firms, Rehmann relied on information provided by Mann to prepare his returns. The information provided to Rehmann by Mann in any particular tax year was overlayed with information existing for the immediately prior tax year.[2] In other words, Rehmann carried over tax information from year to year, such as the number and identities of an entity's members or an entity's classification for tax purposes, and updated the numerical inputs. The onus fell on Mann to update Rehmann throughout the year as to any relevant changes. Typically, Mann would email or call Locricchio with any such changes, and Locricchio would note any relevant updates in the appropriate taxpayer's "Go File Room," *i.e.*, software used by the firm to store notes for clients' files (essentially an electronic file for each taxpayer).

One of the business entities affiliated with Mann for which Rehmann prepared tax returns was Gravity Imaging. Gravity Imaging was in the business of providing MRI services to patients. As relevant to this Case, Gravity Imaging filed a partnership return on Form 1065 for calendar year 2016, calendar year 2017 and the tax year beginning January 1, 2018, and ending May 31, 2018. Gravity Imaging's partnership return for calendar year 2016 was marked as the entity's initial partnership return, and the short-year 2018 return was marked as the entity's final partnership return.

In 2016 and 2017, Gravity Imaging issued a Schedule K-1[3] to two partners: Mann Global, which had a 50% interest in the partnership; and Robin Street, which had a 50% interest in the partnership. In 2018, Robin Street's interest in Gravity Imaging was reflected as 0% on its Schedule K-1, and a third partner was issued a Schedule K-1: 4 Health Management LLC ("4 Health"), which had a 50% interest in the partnership. Robin Street's 2018 Schedule K-1 further showed the following capital account analysis in item L: a beginning capital account of $244,429, no capital contributed during the year, $0 current year increase

---

[2] FD-302, Sarah Cowie (Date of entry 03/28/2023).

[3] As described in the IRS instructions to Schedule K-1, "[t]he partnership uses Schedule K-1 to report [each partner's] share of the partnership's income, deductions, credits, etc."

(decrease), withdrawals and distributions of $224,429, and an ending capital account of $0.

The Government alleges in count eight of the Third Superseding Indictment (the "Indictment") that Locricchio "did willfully aid and assist in, procure, counsel, and advise the preparation and presentation to the IRS of a false and fraudulent Form 1065 for Gravity Imaging for the calendar year 2018."[4] According to the Government, such return was false and fraudulent as to a material matter, in that, *inter alia*:

    i.    Gravity Imaging filed a partnership return on Form 1065, when it was "operated by [Mann] as a Sole Proprietorship that he solely owned from January through May 30, 2018";

    ii.    Robin Street's 2018 Schedule K-1 shows distributions of $244,429 "when no distributions or funds were distributed by Gravity Imaging to Robin Street in 2018"; and

    iii.    Line 20 other deductions of $600,733, including professional expenses of $563,206 that includes $215,033.50 in payments to J&A during January 2018 "were not payments to J&A for legitimate marketing expenses."

The following information formed the basis of Rehmann's preparation of Gravity Imaging's 2018 partnership tax return as relevant to such allegations.

Treatment of Gravity Imaging as a Partnership in 2018

As discussed above, Gravity Imaging was treated as a partnership for tax purposes in 2017, with two partners – Mann Global and Robin Street.[5]

Robin Street and Mann Global parted ways at the end of 2017. More specifically, on December 21, 2017, the parties entered into a letter agreement (the "Redemption Agreement"), pursuant to which Gravity Imaging redeemed Robin Street's membership interest in the partnership for $200,000 cash.[6]

Thereafter, 4 Health was admitted as a 50% member of Gravity Imaging on January 1, 2018, pursuant to a letter agreement entered into by Gravity Imaging and 4 Health (the "Letter Agreement").[7]

---

[4] Indictment, paragraph 128.

[5] Gravity Imaging converted to a partnership in 2016, when Robin Street was admitted as a member. Prior to such time, the entity was wholly owned by Mann Global (which was wholly owned by Mann); accordingly, Gravity Imaging was treated as disregarded as an entity separate from Mann for tax purposes, and all of the profit and loss from Gravity Imaging's business was reported on Schedule C of Mann's individual tax return, filed on Form 1040.

[6] The Redemption Agreement stated, *inter alia*:

  Let this letter serve as formal communication between [Robin Street] and [Gravity Imaging]. Robin Street and Gravity [Imaging] were in business at a MRI facility where they [co-owned] Gravity Imaging the center. Both parties wish to cancel said agreement effective today 12/21/2017. This is a full release of the parties, Gravity [Imaging] is giving [Robin Street] a buy out for their interest a ck for $200,000.00. This money was received by selling the remaining [receivables] in said company. Robin Street by accepting this ck of $200,000 is releasing their claim to any of the [receivables] now or in the past.

[7] The Letter Agreement stated, *inter alia*:

4

Kyle Davis, the controller for Mann's businesses, emailed Locricchio on January 10, 2018, updating her on Gravity Imaging's ownership changes,[8] and Mann emailed Locricchio the entity information for 4 Health on January 29, 2018 (the "January 29th Email").[9] Mann further confirmed Robin Street's redemption via email to Locricchio on February 13, 2018.[10]

On May 30, 2018, Mann Global sold its membership interest in Gravity Imaging to 4 Health for $150,000, pursuant to a Sale of Membership Interest Agreement (the "Sale Agreement").

Capital Account Adjustment of Robin Street

In connection with the redemption of Robin Street's membership interest in Gravity Imaging, Locricchio made a note in the Go File Room of Gravity Imaging on February 14, 2019, to increase Mann Global's capital account in Gravity Imaging by the amount of Robin Street's remaining capital account balance after the redemption of Robin Street's membership interest.[11] Per Locricchio's note, such increase to Mann Global's capital account did not create a corresponding increase to Mann Global's outside basis in the partnership.

This was reflected in the capital account analysis of each of Robin Street and Mann Global, shown in item L of each of their respective Schedule K-1. The accompanying statement to each such Schedule K-1 described the adjustment as "transferred capital," with a footnote on the statement accompanying Mann Global's Schedule K-1 that "the transfer of member capital in the amount $244,429 is not considered an increase in partnership basis."

J&A Payments

At the outset of 2018, Mann intended for J&A to be admitted as a member of Gravity Imaging, in exchange for marketing services provided to the partnership. However, the parties never came to a meeting of the minds. Mann's January 29th Email notified Locricchio that J&A "did not work out" and that payments made by Gravity Imaging to J&A should be characterized as "marketing expense[s]." The general ledger of Gravity

---

Let this letter serve as formal communication and understanding of our agreement in whole. In Jan 2018 Gravity Imaging brought in [4 Health] as a 50% partner into its business…The deal is that Gravity and [Mann Global] would run, operate, manage and control the billing and collections for the business. Mirna Kamal Fayad who owns clinics and medical companies and owns and operates [4 Health] would bring all the business.

[8] The email (subject, "Gravity Imaging – Ownership") read as follows:
Per [Mann]:
50/50 ownership in 2017 – Mann Global / Robin Street Consultants
50/50 ownership in 2018 – Mann Global / J&A Consultants

[9] The January 29th Email (subject, "Gravity Imaging") read as follows:
Rachel [4 Health] is the partner LLC 50 percent at Gravity. [J&A] did not work out change to a marketing expense and send out a 1099 ASAP or let me know what we need to do. I'll forward a new OA in the next couple of days call with questions.

[10] Indictment, paragraph 122, states that such email read:  "Robin Street was bought (*sic*) in (*sic*) DEC 31st 2017."

[11] Specifically, Locricchio's note stated:
Member capital of [Robin Street] was not redeemed in cash.
Considered a redemption by the partnership and increases [Mann Global]'s capital account as of 1/1/18.
Increase in [Mann]'s capital account is not an increase in his basis in the partnership.

5

Imaging reflected such "marketing expense" characterization for the five checks issued to J&A during January 2018, totaling $215,033.50.[12]

As relevant to the counts against Locricchio, the Government intends to introduce expert witness testimony from the IRS Agent as to the following determinations (each, a "Determination" and collectively, the "Determinations"):

1. During the 2017 calendar year and from January 1, 2018, to May 30, 2018, Gravity Imaging was a single member LLC that should have been treated as a disregarded entity, rather than a partnership, for federal tax purposes, and, therefore, Mann should not have filed a partnership return for those years.

2. Even if Robin Street is treated as a partner of Gravity Imaging, the partnership was created to transfer payments for illegal referrals, which does not constitute a substantial business purpose under Treasury Regulation Section 1.701-2(a)(1) and, therefore, Gravity Imaging is not a partnership.

3. The Form 1065 for Gravity Imaging for 2018 reported false and fraudulent information on the 2018 Schedule K-1 for Robin Street on Line 19A. (My presumption is that the IRS Agent is of the opinion that the $244,429 reported on Line 19A, corresponding to the transfer of Robin Street's capital account balance to Mann Global in connection with Robin Street's redemption from Gravity Imaging, resulted in a taxable capital shift to Mann Global.)

4. The Form 1065 for Gravity Imaging for 2018 reported false and fraudulent information on Line 20 by including amounts paid to J&A in 2018 that were not payments for legitimate marketing expenses.

## IV. DISCUSSION AND ANALYSIS

**1. The Government cannot challenge the treatment of Gravity Imaging as a partnership for U.S. federal income tax purposes in this Case, nor any of the reporting positions on Gravity Imaging's partnership return, as the IRS did not follow the procedural requirements set forth in the Code to do so.**

The IRS Agent's Determinations are all "partnership items"[13] of Gravity Imaging, and the IRS Agent failed to recognize that each of her Determinations is an impermissible determination in an individual matter. In order for the Government to assert the IRS Agent's Determinations outside of a partnership audit of Gravity Imaging, the IRS would have needed to provide written notice to Mann. Given no such notice was provided in this Case, the Government's position is in violation of the applicable provisions of the Code, as discussed below.

Generally, any challenge by the Government of a partnership-related item (including the partnership's existence for U.S. federal income tax purposes[14]) must be in compliance with the applicable partnership audit regime in existence under the Code for the partnership taxable year at issue. For partnership taxable years beginning on or before December 31, 2017, unified partnership audit and litigation rules were

---

[12] The memo section of each such check stated "Membership Distribution" in accordance with the parties' initial intent.

[13] The term "partnership item" generally means, with respect to a tax partnership, any item required to be taken into account for the partnership's taxable year under the Code, such that it is more appropriately determined at the partnership level than at the partner level. *See* Section 6231(a)(3) under TEFRA (defined below). *See also* Treas. Reg. Section 301.6241-1(a)(6)(ii), defining "partnership-related item" for purposes of the BBA (defined below).

[14] *See, e.g., Deitch v. Comm'r*, T.C. Memo 2022-86.

6

contained in former subchapter C of chapter 63 of the Code, enacted by the Tax Equity and Fiscal Responsibility Act of 1982, Public Law 97-248 ("TEFRA"). The TEFRA partnership procedures were repealed by the Bipartisan Budget Act of 2015, Public Law 114-74 ("BBA") and replaced with a centralized partnership audit regime that determines adjustments and, in general, determines, assesses, and collects tax at the partnership level. The BBA rules are effective generally for returns filed for partnership taxable years beginning after December 31, 2017.

Both TEFRA and the BBA partnership audit regimes generally require the IRS to resolve partnership-related items through a single centralized proceeding at the partnership level. However, in the case of special enforcement matters—such as a partner under criminal investigation for violation of the internal revenue laws relating to income tax—the IRS may make adjustments or determinations about partnership-related items solely with respect to the partner under criminal investigation, provided that certain notice requirements are satisfied.

In the case of TEFRA, Treasury Regulation Section 301.6231(c)-5(a) provides that partnership items of a partner under criminal investigation "shall be treated as nonpartnership items as of the date on which the partner is notified that the partner is the subject of a criminal investigation and written notification is sent by the Internal Revenue Service that the partner's partnership items shall be treated as nonpartnership items. The partnership items of a partner who is notified that the partner is the subject of a criminal investigation shall not be treated as nonpartnership items under this section unless and until such partner is sent written notification from the Internal Revenue Service of such treatment."[15]

This rule permitting the IRS to adjust partnership-related items with respect to a partner under criminal investigation without regard to the partnership audit procedures, *if proper notice is given*, was continued under the BBA.[16] Specifically, Treasury Regulation Section 301.6241-7(d) provides that "[f]or any taxable year of a partner or indirect partner for which the partner or indirect partner is under criminal investigation, the IRS may adjust any partnership-related item with respect to such partner or indirect partner without regard to subchapter C of chapter 63." However, if the IRS so determines that some or all of the audit rules do not apply to any partnership-related item (or portion thereof), the IRS must "notify, in writing, the taxpayer to whom the adjustments are being made."[17]

In this Case, the filing of a Form 1065 for Gravity Imaging provides prima facie evidence that there was a partnership for U.S. federal income tax purposes.[18] As discussed above, the partnership audit rules require a BBA/TEFRA proceeding to challenge the treatment of Gravity Imaging as a partnership unless appropriate notice was given. Because the IRS never provided any such written notification to Mann that an adjustment was being made without regard to the applicable audit procedural requirements for each taxable year in which the IRS Agent attempts to disregard Gravity Imaging as a partnership for U.S. federal income tax purposes, no such determination can be made.

---

[15] Emphasis added.
[16] Section 6241(11)(A).
[17] Treas. Reg. Section 301.6241-7(h)(1) (emphasis added).
[18] *See* discussion below accompanying note 24.

**2.** **Even assuming *arguendo* that the Government had followed the procedural requirements to notify Mann as to the IRS' treatment of Gravity Imaging as a disregarded entity, the IRS Agent's Determination as to such treatment is incorrect under subchapter K of the Code and relevant case law.**

Even if the Government had complied with the notification requirements discussed in #1 above necessary to disregard Gravity Imaging as a partnership for U.S. tax purposes, the IRS Agent's Determination as to such treatment is critically flawed in two respects.

First, with respect to Robin Street's admission as a member of Gravity Imaging in 2016, Gravity Imaging's tax classification automatically changed under the check-the-box regulations. As provided in Treasury Regulation Section 301.7701-3(f)(2), "[a] single member entity disregarded as an entity separate from its owner is classified as a partnership when the entity has more than one member."[19] Thus, Gravity Imaging did not need to file an Entity Classification Election on Form 8832 to be treated as a partnership in 2016 when Robin Street was admitted as a partner.

The IRS Agent is of the opinion that Robin Street should not be treated as a valid partner of Gravity Imaging for U.S. federal income tax purposes; however, the IRS Agent glaringly ignores the intent of the parties in reaching her Determination. There is no clear and precise standard as to whether a person will be respected as a partner in a partnership for U.S. federal income tax purposes. The Code sets forth two separate definitions of "partner." Section 761(b) states that a "partner" means "a member of a *partnership*," which is defined under Section 761(a) as including "a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a corporation or a trust or estate." Similarly, Section 7701(a)(2) defines a "partnership" as "a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation" and defines a "partner" as "a member in such a syndicate group, pool, joint venture or organization."

Notably, the definition of the term "partnership" sheds significant light on the definition of the related term "partner."[20] Because a partnership can exist only in the context of an economic relationship between one person and others, the questions as to whether a partnership exists and whether specific persons are partners are restatements of each other.

In *Commissioner v. Culbertson*,[21] the Supreme Court indicated that a partnership exists when:

> considering all the facts--the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent--the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.[22]

---

[19] Treas. Reg. Section 301.7701-3(f)(2).

[20] *Cahill v. Comm'r*, TC Memo 2013-220 (2013) (*citing* William S. McKee et al., Federal Taxation of Partnerships and Partners, para. 3.01[1], at 3-7 (4th ed. 2007)).

[21] 337 U.S. 733 (1949); *see also Comm'r v. Tower*, 327 U.S. 280 (1946).

[22] *Id.* at 742. In *Luna v. Comm'r*, 42 T.C. 1067 (1964), the Tax Court distilled the principles laid down by the Supreme Court in *Tower* and *Culbertson* into the following eight factors that are relevant in evaluating whether parties intend to create a partnership for federal income tax purposes: (1) the agreement of the parties and their conduct in executing its terms; (2) the contributions, if any, which each party has made to the venture; (3) the parties' control over income and capital and the right of each to make withdrawals; (4) whether each party was a principal and

8

Since *Culbertson*, the intent of the parties has been the key factor in determining whether a particular arrangement constitutes a partnership for tax purposes.[23]  If a partnership income tax return is filed by a venture, the members of the venture are virtually precluded from denying their status as partners.[24]

Thus, in this Case, Gravity Imaging's filing of a partnership return on Form 1065 for calendar year 2016, calendar year 2017 and the tax year beginning January 1, 2018, and ending May 31, 2018 evidences the parties' intent for Gravity Imaging to be treated as a partnership for U.S. federal income tax purposes during such time.  The fact that a written partnership agreement was never entered into by the parties does not preclude such treatment; for purposes of subchapter K of the Code—the tax provisions governing partnerships—a partnership agreement "can be oral or written."[25]  Likewise, the fact that Mann had sole signatory power and control over Gravity Imaging accounts and operations (a feature not uncommon among two-party partnerships) does not outweigh the overwhelming intent of the parties' to treat Gravity Imaging as a partnership for U.S. federal income tax purposes.

Second, with respect to Robin Street's redemption as a member of Gravity Imaging, the transitory lapse of a second partner should be disregarded for U.S. federal income tax purposes.  For purposes of subchapter K of the Code, two essential rules apply:  (1) "an existing partnership shall be considered as continuing if it is not terminated";[26] and (2) "a partnership shall be considered as terminated only if no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership."[27]  This rule provides the backdrop against which the IRS Agent's first Determination, alleging that Gravity Imaging ceased to be a partnership for U.S. federal income tax purposes on December 21, 2017, should be viewed.  The IRS Agent relied upon the execution date of the Redemption Agreement to conclude that Mann became the sole owner of Gravity Imaging (through Mann Global) on December 21, 2017, thereby terminating the partnership status of Gravity Imaging as of such date.[28]

---

coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; (5) whether business was conducted in the joint names of the parties; (6) whether the parties filed Federal partnership returns or otherwise represented to the IRS or to persons with whom they dealt that they were joint venturers; (7) whether separate books of account were maintained for the venture; and (8) whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.

[23] *See also Gilford v. Comm'r*, 11 T.C.M. (CCH) 175 (1952), *aff'd*, 201 F.2d 735 (2d Cir. 1953) and *Coffin v. United States*, 120 F. Supp. 9 (S.D. Ala. 1954).

[24] *McManus v. Comm'r*, 583 F.2d 443 (9th Cir. 1978), *cert. denied*, 440 U.S. 959 (1979); *Maletis v. United States*, 200 F.2d 97 (9th Cir. 1952), *cert. denied*, 345 U.S. 924 (1953); *Halstead v. Comm'r*, 296 F.2d 61 (2d Cir. 1961) (per curiam); *Smith v. Comm'r*, 37 T.C.M. (CCH) 1731 (1978); TAM 199907029 (September 30, 1998) (partnership found where parties entered into a partnership agreement and filed partnership tax returns); PLR 9741017 (July 10, 1997) (parties filed partnership tax returns; IRS found intent so no need to look at level of business activity); *cf. Allison v. Comm'r*, 35 T.C.M. (CCH) 1069, 1078 (1976) (no partnership existed; failure to file partnership tax returns described as "admission against interest"); *but see Powell v. Comm'r*, 26 T.C.M. (CCH) 161 (1967) (no partnership even though partnership returns filed).

[25] Treas. Reg. Section 1.761-1(c).

[26] Section 708(a).

[27] Section 708(b)(1).

[28] Presumably relying on Treas. Reg. Section 301.7701-3(f)(2), which provides that "[a]n eligible entity classified as a partnership becomes disregarded as an entity separate from its owner when the entity's membership is reduced to one member."

9

However, the Treasury Regulations under Section 708 indicate that a nominal amount of continuing business or financial activity prevents a partnership from terminating for U.S. federal income tax purposes:

> A partnership shall terminate when the operations of the partnership are discontinued and no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership.  For example, on November 20, 1956, A and B, each of whom is a 20-percent partner in partnership ABC, sell their interests to C, who is a 60-percent partner.  Since the business is no longer carried on by any of its partners in a partnership, the ABC partnership is terminated as of November 20, 1956.  However, where partners DEF agree on April 30, 1957, to dissolve their partnership, but carry on the business through a winding up period ending September 30, 1957, when all remaining assets, consisting only of cash, are distributed to the partners, the partnership does not terminate because of cessation of business until September 30, 1957.[29]

Furthermore, under case law and IRS rulings, if two or more legal actions constitute a single integrated "step transaction," the transaction remains open until the final step.[30]  In this Case, the parties always intended for Gravity Imaging to continue as a partnership after the redemption of Robin Street; to this end, Mann Global continued the operations of the partnership after such redemption.  Initially, J&A was slotted to become the replacement partner of Robin Street, with 4 Health filling such role once the parties determined that J&A would not work out as a partner.  Applying the step transaction doctrine, the parties' intended subsequent transaction of admitting a replacement partner to continue treating Gravity Imaging as a partnership for U.S. federal income tax purposes should be stepped together with Robin Street's redemption.  In other words, because Gravity Imaging continued in business after the redemption of Robin Street and a replacement partner was always intended, the lapse of a second partner for 11 days should be viewed as transitory and disregarded for U.S. federal income tax purposes.

But, even assuming *arguendo* that the IRS Agent was correct in treating Gravity Imaging as terminating as a partnership for U.S. federal income tax purposes upon Robin Street's redemption on December 21, 2017, such termination would not result in any adverse tax consequences to the relevant parties.  The termination would trigger a deemed distribution of the partnership's assets and liabilities to Mann Global, followed by a subsequent contribution of such assets and liabilities upon the admission of 4 Health.[31]  Such transactions would be nontaxable under Section 731 and Section 721, as discussed further in #3 below.  Thus, any termination of Gravity Imaging would not have resulted in any taxable income to Mann, so the IRS Agent's Determination is for naught.  However, for the reasons discussed above, the better view is to treat Gravity Imaging as continuing as a partnership for U.S. federal income tax consequences by stepping together the subsequent admission of 4 Health as a partner, given a replacement partner was always contemplated by the parties.

3. **The IRS Agent's Determination that Gravity Imaging's alleged illegal activity ran afoul of the "substantial business purpose" requirement under the partnership anti-abuse rule of Treasury Regulation Section 1.701-2(a)(1) completely misses the mark of that provision, which is simply a regulatory clarification of the scope and limitations of the judicial tax**

---

[29] Treas. Reg. Section 1.708-1(a); *see also, e.g., Baker Commodities, Inc. v. Comm'r,* 415 F.2d 519 (9th Cir. 1969), *aff'g* 48 TC 374 (1967) (*cert. denied*) (termination does not occur until all the assets of a partnership are distributed to the partners and all partnership activity ends); *Michael H. Gulley*, 79 TCM 2171 (2000) (no termination of partnership upon transfer of interest to partner's Chapter 7 bankruptcy estate).

[30] *See, e.g., Comm'r v. Clark*, 489 U.S. 726 (1989) ("Under [the step transaction] doctrine, interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction."); Rev. Rul. 79-250 ("The step transaction doctrine generally permits a series of formally separate steps to be amalgamated and treated as a single transaction if they are in substance integrated, interdependent, and focused toward a particular end result."); PLR 8202025.

[31] *See* Rev. Rul. 99-6; Rev. Rul. 99-5; Section 731; Section 721.

**doctrines to prevent tax abuse.**

The IRS Agent's misapplication of the partnership anti-abuse rule under Treasury Regulation Section 1.701-2 shows a clear lack of familiarity and understanding of partnership taxation.

The partnership anti-abuse rules, set forth in Treasury Regulation Section 1.701-2, state that the partnership rules under subchapter K of the Code are intended to permit taxpayers to conduct joint business (including investment) activities through a flexible economic arrangement without incurring an entity-level tax.[32]   A transaction can be recast by the IRS under the partnership anti-abuse rules if, but only if, a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K.[33]

A partnership transaction is consistent with the intent of subchapter K if it meets the following requirements (collectively, the "Intent Requirements"): (1) the partnership is bona fide; (2) each partnership transaction or series of related transactions is entered into for a substantial business purpose; (3) the form of each partnership transaction is respected under substance-over-form principles; and (4) the tax consequences to each partner of partnership operations and of transactions between the partner and the partnership accurately reflect the partners' economic agreement, and the tax consequences to each partner of partnership operations and of transactions between the partner and the partnership clearly reflect the partner's income.[34]

Nowhere in the Intent Requirements is there a requirement for a partnership's activities to be legal.  Indeed, the sole function of the partnership anti-abuse rules is to ensure a transaction is consistent with the intent of subchapter K.  The IRS Agent failed to recognize that "substantial business purpose" is a term of art in partnership taxation used to refer to a non-tax motivated purpose.[35]   An arrangement satisfies the "substantial business purpose" requirement if it has a genuine, nontax business purpose; the legality of the arrangement is irrelevant for this test.  For example, if Al Capone and John Dillinger formed a partnership to engage in bootlegging—a clearly illegal activity—their arrangement would still constitute a partnership for tax purposes without regard to the activities of their venture.

The IRS Agent is clearly not aware of the preambles to the proposed and final Treasury Regulations under Section 701, which make clear that the purpose of the regulations was to comport with the tax judicial doctrines and not to treat a partnership as "abusive" because of the nature of its business:

> The anti-abuse rule in this final regulation applies to the operation and interpretation of any provision of the Code and the regulations thereunder that may be relevant to a particular partnership transaction (including income, estate, gift, generation-skipping, and excise tax). The anti-abuse rule in the final regulation is expected primarily to affect a relatively small number of partnership transactions that make inappropriate use of the rules of subchapter K. The regulation is not intended to interfere with bona fide joint business arrangements conducted through partnerships.[36]

---

[32] Treas. Reg. Section 1.701-2(a).
[33] Treas. Reg. Section 1.701-2(b).
[34] Treas. Reg. Section 1.701-2(a).
[35] *See, e.g., Countryside Limited Partnership v. Comm'r*, T.C. Memo 2008-3.
[36] TD 8588 (12/29/1994).

11

4.      **The Schedule K-1s issued by Gravity Imaging for the 2018 taxable year accurately reported the $244,429 "distribution" to Robin Street as a transfer of capital to Mann Global, resulting in a nontaxable event.**

The IRS Agent's Determination that the Form 1065 for Gravity Imaging for 2018 reported false and fraudulent information on the 2018 Schedule K-1 for Robin Street on Line 19A is incorrect.  What the IRS Agent failed to note is that the $244,429 distribution amount shown on Line 19A of Robin Street's Schedule K-1 corresponds to the $244,429 amount shown under "[w]ithdrawals & distributions" on item L (partner capital account analysis) of Robin Street's Schedule K-1, which corresponds to the $244,429 amount shown under "[c]apital contributed during the year" on item L (partner capital account analysis) of Mann Global's Schedule K-1.  Further, the accompanying statements to each such Schedule K-1 describe the item L amounts as "transferred capital," with a footnote on the statement attached to Mann Global's Schedule K-1 stating that "the transfer of member capital in the amount $244,429 is not considered an increase in partnership basis."

In other words, the $244,429 "distribution" on Line 19A of Robin Street's 2018 Schedule K-1 was nothing more than a transfer of Robin Street's remaining capital account balance to Mann Global in connection with Robin Street's redemption from Gravity Imaging, which is a nontaxable event, as discussed below.  I examined the 2018 Schedule K-1 for each of Robin Street and Mann Global, and the transaction was properly reported, including the notation that Mann Global's basis in Gravity Imaging was not increased as a result of the transferred capital, which is the correct treatment under subchapter K of the Code.[37]

The IRS Agent determined that the capital shift from Robin Street to Mann Global was a taxable event; however, a capital shift can be taxable only if it is compensatory in nature under Treasury Regulation Section 1.721-1(b)(1):

> Normally, under local law, each partner is entitled to be repaid his contributions of money or other property to the partnership (at the value placed upon such property by the partnership at the time of the contribution) whether made at the formation of the partnership or subsequent thereto. <u>To the extent that any of the partners gives up any part of his right to be repaid his contributions (as distinguished from a share in partnership profits) in favor of another partner as compensation for services (or in satisfaction of an obligation), section 721 does not apply.</u> The value of an interest in such partnership capital so transferred to a partner as compensation for services constitutes income to the partner under section 61. The amount of such income is the fair market value of the interest in capital so transferred, either at the time the transfer is made for past services, or at the time the services have been rendered where the transfer is conditioned on the completion of the transferee's future services.[38]

If a capital shift is not compensatory, then at most there is a deemed distribution of property from the partnership to the transferor partner followed by a recontribution of that property by the transferee partner. Both such transactions are nontaxable under Section 731 and Section 721, respectively, as discussed below.

In the case of a distribution by a partnership to a partner, Section 731(a)(1) provides that "gain shall not be recognized to such partner, except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution."  Accordingly, a deemed distribution of Robin Street's $244,429 remaining capital account balance to Robin Street would be nontaxable.

---

[37] *See* Section 705.
[38] Emphasis added.

In the case of a contribution of property to a partnership in exchange for an interest in the partnership, Section 721(a) provides that "no gain or loss shall be recognized to [the] partnership or to any of its partners." This rule applies whether the contribution is made to a partnership in the process of formation or to a partnership which is formed and operating.[39] Thus, a deemed contribution of $244,429 by Mann Global would be nontaxable to Gravity Imaging and Mann Global.

Therefore, even if the $244,429 capital shift is treated as a taxable transaction, the resulting deemed distribution and contribution would not give rise to any tax consequences. Rather, any tax consequences to Mann Global would be deferred until Mann Global sold its partnership interest. Given that Mann Global's basis in Gravity Imaging was not increased in connection with the transfer of Robin Street's capital to Mann Global (as noted in Mann Global's 2018 Schedule K-1), any inherent gain in connection which such transfer was triggered upon Mann Global's subsequent sale of its partnership interest.[40]

5. **The $215,033.50 payments to J&A during January 2018, whether treated for U.S. federal income tax purposes as (i) a fee to a nonpartner of Gravity Imaging, (ii) a guaranteed payment to a partner of Gravity Imaging for services performed in a nonpartner capacity or (iii) an allocation of income to a partner of Gravity Imaging, would result in the same tax consequences for Gravity Imaging and Mann Global, *i.e.*, Mann's tax liability for 2018 would be identical in each such case.**

The IRS Agent determined that the Form 1065 for Gravity Imaging's 2018 taxable year reported false and fraudulent information on Line 20 that included amounts paid to J&A in 2018 that were not payments for legitimate marketing expenses. Presumably, this is in support of the Government's allegation that payments made by Gravity Imaging to J&A were neither member distributions nor marketing expenses. However, whether such payments are characterized as guaranteed payments to J&A for services performed in a nonpartner capacity, an allocation and distribution of income (*i.e.*, payments made to a partner acting in a partner capacity), or fees paid to a nonpartner, the resulting tax consequences from the perspective of Mann Global are identical; each such characterization would reduce Mann Global's taxable income and trigger ordinary income to J&A.

Generally, under the statutory framework of subchapter K of the Code, an allocation or distribution between a partnership and a partner for the provision of services can be treated in one of three ways: (1) as a distributive share under Section 704(b); (2) as a guaranteed payment under Section 707(c); or (3) as a transaction in which a partner has rendered services to the partnership in its capacity as other than a partner under Section 707(a). From the perspective of the partnership, the third category is akin to a payment made to a nonpartner service provider. Each of the three payment categories will reduce the taxable income flowing through to the other partners of the partnership—either as a reduction of the income allocable to such other partners (category 1) or as a deductible expense offsetting the partnership's taxable income (categories 2 and 3).

In this Case, the parties properly reported the payments from Gravity Imaging to J&A as marketing expenses paid to J&A, *i.e.*, a third-party service provider. Such payments were deducted by the partnership under Section 162 and triggered ordinary income to J&A. Even if J&A were somehow viewed as a partner of Gravity Imaging (which is inconsistent with the parties' final intent and documentation of the payments as reflected in Gravity Imaging's general ledger), such that the payments to J&A were either guaranteed payments under Section 707(c) or an allocation of Gravity Imaging's income under Section 704(b), the tax results would be the same. That is, Gravity Imaging's income flowing through to Mann Global would be reduced by the amount of such payments, either under Section 162 (if the payments are treated as fees or

---

[39] Treas. Reg. Section 1.721-1(a).
[40] Section 741, Section 1001(a).

13

guaranteed payments) or as a result of being allocated to a separate partner (if the payments are treated as a distributive share of partnership income), and the resulting income to J&A would be ordinary income under each such scenario.  Thus, the IRS Agent's Determination in this regard is nonsensical, as there is no impact from a U.S. federal income tax perspective on any of the parties.

Respectfully submitted,

Richard M. Lipton

Dated:  April 26, 2024

14

**ADDENDUM**

In connection with this report, I was provided, and considered to the extent relevant, the following documents and exhibits/attachments thereto:

1.      Government Response to Court Inquiry Regarding Disclosure Pursuant to Fed. R. Crim. P. 16(a)(1)(G) Regarding Potential Witness Providing Opinion Testimony, United States of America v. Cory Justin Mann and Rachel Locricchio, Case No. 4:20-CR-20599, U.S. Dist. Ct. E.D. Mich. S. Div. (filed 04/22/2024).

2.      Defendants' Joint Response to Government's Motion in Limine and Brief in Support Seeking an Expedited Hearing to Admit Government Expert Witness Testimony [ECF. 550], United States of America v. Cory Justin Mann and Rachel Locricchio, Case No: 20-20599, U.S. Dist. Ct. E.D. Mich. S. Div. (filed 04/04/2024).

3.      Government's Supplemental Expert Witness Notice Pursuant to Fed. R. Crim. P. 16(a)(i)(G) for Counts Six through Nine, United States of America v. Cory Justin Mann and Rachel Locricchio, Case No. 4:22-CR-20599, U.S. Dist. Ct. E.D. Mich. S. Div. (filed 03/01/2024).

4.      Government's Expert Witness Notice Pursuant to Fed. R. Crim. P. 16(a)(i)(G) for Counts Six through Nine, United States of America v. Cory Justin Mann and Rachel Locricchio, Case No. 4:22-CR-20599, U.S. Dist. Ct. E.D. Mich. S. Div. (filed 09/16/2023).

5.      Third Superseding Indictment, United States of America v. John Angelo, Cory Justin Mann, Rosina Angelo, Michael Daneshvar, Glenn Phillip Franklin, III, Brent Farouk Sitto, Thomas Reed Quartz and Rachel Diane Locricchio, Case No. 4:20-CR-20599, U.S. Dist. Ct. E.D. Mich. S. Div. (filed 08/16/2023).

6.      Jury Trial – Volume 4A, United States of America v. John Angelo and Rosina Angelo, Case No. 20-20599, U.S. Dist. Ct. E.D. Mich. S. Div. (filed 07/15/2023).

7.      Response to Government's Proffer Regarding Co-Conspirator Statements, United States of America v. Rachel Locricchio, Case No: 20-20599, U.S. Dist. Ct. E.D. Mich. S. Div. (filed 06/12/2023).

8.      Pages 44-57 of Government's Proffer Regarding Co-Conspirator Statements, United States of America v. Rachel Locricchio, Case No: 20-20599, U.S. Dist. Ct. E.D. Mich. S. Div. (filed 06/12/2023).

9.      FD-302, Mary Lou Miller (Date of entry 05/01/2023).

10.     FD-302, Sarah Cowie (Date of entry 03/28/2023).

11.     FD-302, Kyle Davis (Date of entry 03/28/2023).

12.     FD-302, Bryan Kearis (Date of entry 03/24/2023).

13.     FD-302, Rachel D. Locricchio (Date of entry 03/08/2023).

14.     FD-302, Bryan Kearis (Date of entry 02/21/2023).

15.     FD-302, Rachel D. Locricchio (Date of entry 02/21/2023).

16.     FD-302, Rachel D. Locricchio (Date of entry 02/01/2023).

17.     FD-302, Rachel D. Locricchio (Date of entry 02/06/2023).

18.     FD-302, Rachel D. Locricchio (Date of entry 09/15/2022).

19.     FD-302, Kyle Davis (Date of entry 05/11/2022).

20.     FD-302, Rachel D. Locricchio (Date of entry 03/04/2022).

21.     FD-302, Kyle Davis (Date of entry 03/01/2022).

22.     FD-302, Rachel D. Locricchio (Date of entry 11/02/2020).

23.     Gravity Imaging, LLC, Balance Sheet, as of May 31, 2018.

24.     Gravity Imaging, LLC, 2018 General Ledger.

25.     Gravity Imaging, LLC, 2018 Form 1065, U.S. Return of Partnership Income.